Filed 1/8/26  P. v. Mayes CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B332068 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. NA112863) |
| v. | |
| CARL MAYES, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, James Otto, Judge.  Affirmed.

Kelly C. Martin, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Noah P. Hill and Eric J. Kohm, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury found Carl Mayes guilty of the second degree murder of his wife and of possession of a firearm by a felon. Mayes contends the trial court committed error by denying his motion to sever trial of these counts, admitting a hearsay statement from the murder victim, and excluding evidence of his reaction to news of his wife's death. He further contends the court erred by denying his request for a continuance to prepare a motion for a new trial after granting his motion under _Faretta v. California_ (1975) 422 U.S. 806. We find no reversible error and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### _Murder of Tyquesha Myers_

On the morning of July 15, 2006, Tyquesha Myers's body was found on the side of the 710 freeway. She had a gunshot wound to her right temple. There was no blood under or around her body, but there was dry blood on her clothes.

The cause of death was a single gunshot wound to the right side of the head, fired within a range of five inches. The bullet was a .22-caliber. It was estimated that Myers died 24 to 30 hours before she was found.

### _Testimony of Myers's mother_

Mayes and Myers married a few months before July 2006. During their relationship, Myers's mother, Vanessa Garland, observed facial bruises and a black eye on Myers on separate occasions.[1] Once, when Mayes and Myers were arguing, Garland

_____

[1]   Garland confronted Mayes about Myers's injuries. Once at Mayes's barbershop, Garland told Mayes "to keep his hands off

observed that Mayes had a gun.  Although Mayes and Myers had previously lived together at Mayes's barbershop in Gardena, the couple had a "rocky" relationship and were living apart when Myers was killed.

On the evening of Thursday, July 13, 2006, Garland picked Myers up and they stopped at the barbershop.  Myers went inside while Garland remained in the car.  When Myers left the barbershop, she was upset because Mayes had something that belonged to her.  Garland dropped Myers back at the barbershop in the early morning of Friday, July 14 because Myers wanted to collect her things.

Garland saw Mayes's car when she parked outside the barbershop.  Myers went into the barbershop and returned approximately 10 minutes later.  They agreed that Myers would call Garland later so that Garland could pick her up.  Myers said she would leave with Garland after getting her things.

Garland received a call from Myers while driving home.  Myers told Garland to call her back when Garland made it home safely.  The call ended abruptly.  Garland heard a "scuffle" and movement before the call ended.  Garland continued driving because Mayes often ended calls between Myers and Garland.  Garland knew that Mayes did not want Myers talking to her.

Garland later had a missed call from Myers.  She repeatedly tried to call Myers back throughout the day but got no

_____

[her] motherfucking child" and if "he ke[pt] putting his hands on her, [she] would f-ing kill him."  Garland had also spoken to Mayes on the phone about his abuse of Myers before the pair married.  She told him that "he should leave [Myers] alone and keep his hands off of her because one day he was going to kill her."

answer.  The calls went directly to voicemail.  The morning of Saturday, July 15, 2006, Garland received a call from Mayes.  This was unusual because Mayes did not like her.  Mayes said Myers was missing and asked if Garland had seen her.  Later that morning, Garland learned from the Los Angeles County Sheriff's Department that Myers was dead.

### Testimony of Hasheem Solomon

In 2006, Hasheem Solomon had known Mayes for approximately one year.  He worked at Mayes's barbershop and sometimes stayed after hours to socialize with customers and Mayes.  Solomon saw Myers "briefly" at the barbershop.  The times he saw her, Mayes and Myers were "[a]lways angry, always fighting," both verbally and physically.  He had observed Mayes and Myers "grabbing, tussling."

In the evening of July 13 or early morning of July 14, after the barbershop had closed, Mayes received a phone call.  Solomon heard arguing.  About 20 to 30 minutes later, Solomon saw Myers get dropped off.  He saw her enter the barbershop and walk to the back.  Mayes followed her.  Solomon heard Mayes and Myers arguing.  Myers said she was leaving and Mayes "kept saying sit down, sit down."  Solomon also heard a sound "like a book slamming against the floor" or "a pop-like sound."  After that, he heard Mayes continuing to talk.

Solomon returned to work at 8:00 or 9:00 a.m.  Mayes was acting "nervously."  Mayes called Solomon into the back room of the shop.  Mayes was drinking, which was unusual given the time of day.  Mayes told Solomon he had shot his wife.  Mayes had put the gun to her head and "was just trying to scare her and it went off."  He said the gun was a "deuce-deuce."  Solomon had seen the gun at the barbershop before.  Mayes said he had

4

wrapped his wife's body in a rug or blanket and put it in the trunk of his gray Jaguar. Mayes told Solomon to say that Myers "went walking off in the middle of the night" if anyone asked. Mayes planned to "dismember her, like to try to dump her somewhere." Mayes left the shop by himself at some point that day. He later told Solomon that he had dumped his wife's body on the side of the 710 freeway.

The next day, July 15, 2006, police officers came to the barbershop. Solomon did not tell the police what he knew because he was an active gang member at the time and did not want to snitch. He also felt a sense of loyalty to Mayes.

Solomon spoke with detectives about Myers's murder in 2010, when he was in jail for attempted murder. He was "possibly" hoping that speaking to them would benefit him. However, he told the truth and did not get a deal. Detectives spoke to Solomon again in 2017 and he again told them the truth. Solomon said he did not expect a deal at that time because he had already been sentenced. His mindset was "doing the right thing." At the time of his trial testimony, Solomon was still in custody for attempted murder and was serving additional time for later charges. He did not have his sentence reduced for assistance he provided in this or any other case.

**_Testimony of Mayes's Former Private Investigator_**

When he was appointed, Mayes's private investigator told Mayes he would not convey personal messages.

On August 12, 2020, the investigator visited Mayes at the Los Angeles County Jail. Mayes asked the investigator to deliver a letter to Mayes's mother. A deputy informed Mayes he could not give the letter to the investigator. Mayes turned his back to the deputy and put the letter in between other paperwork he was

providing to the investigator.  The investigator notified the deputy and handed over the envelope.  The investigator later provided the letter to the trial court and asked to be taken off the case.  The trial court granted his request.

Mayes's letter asked his mother to call someone named "Zay," whom Mayes wanted his private investigator to interview regarding the night of July 13, 2006.  The letter laid out what Mayes wanted "Zay" to tell the investigator: that "Zay" came to the barbershop between 5:30 and 6:00 p.m., when Mayes and Solomon were the only people working; "Zay" asked Solomon to give him a tattoo while Mayes was cutting hair; "Raheem" showed up and the group drank together; Solomon finished the tattoo around 10:00 or 10:30 p.m.; "Raheem," "Zay," and Solomon left at around 11:10 to 11:15 p.m. and Mayes went to sleep.

### Physical Evidence

In September 2006, the Long Beach Police Department and members of the Los Angeles Sheriff's Department Forensic Team executed a search warrant at Mayes's barbershop.  The Forensic Team located a blanket in the back of the barbershop with blood stains that were later determined to match Myers's DNA.

The 2006 search of the shop also uncovered nine-millimeter cartridges and various drugs.  Mayes's Jaguar was never recovered.

### Possession of Firearm by Felon

In 2019, the Long Beach Police Department conducted surveillance on Mayes at the direction of homicide detectives.  Officers observed Mayes going in and out of an RV.  Mayes used a key to unlock the door and was by himself.  Officers arrested

Mayes and searched the RV.  They found Mayes's barber's license and a backpack containing a loaded .45-caliber pistol.

Mayes was identified as one of four contributors to DNA taken from the .45-caliber gun.  Mayes's probable percentage of contribution of DNA was 10 percent for a swab taken from the pistol grip, trigger, slide grip, and levers of the gun.  Another individual was identified as a "major contributor" of DNA, with a probable percent of contribution of 97 percent for one swab and 72 percent for another.

### Charges, Conviction, and Sentencing

In July 2022, the People charged Mayes with murder (Pen. Code, § 187, subd. (a); count 1) and possession of a firearm by a felon (*id*., § 29800, subd. (a)(1); count 2).[2]  With respect to count 1, the information also alleged firearm enhancements pursuant to section 12022.53, subdivisions (b) through (d).

A jury found Mayes guilty of second degree murder and found that he personally and intentionally discharged a firearm, causing great bodily injury and death in the commission of the murder.  It also found him guilty of possession of a firearm by a felon.  The court sentenced Mayes to an aggregate sentence of 40 years to life on count 1, consisting of 15 years to life on the murder count, plus 25 years pursuant to section 12022.53, subdivision (d).  The court sentenced Mayes to the low term of 16 months on count 2.

Mayes timely appealed.

---

[2]  All undesignated statutory references are to the Penal Code.

## DISCUSSION

I.   **The Trial Court's Denial of the Request To Sever Counts 1 and 2 Was Not Prejudicial**

Mayes argues that the trial court erred in denying his motion to sever the murder and possession of a firearm by a felon counts because the requirements for joinder under section 954 were not met, and the error was prejudicial under any standard. We conclude any error was harmless.

### A.   Background

Mayes moved to sever the possession of a firearm by a felon count from the murder count. He argued that the gun law enforcement officers located in the RV in 2019 was not the murder weapon and it had no relevance to the murder charge. He further argued that by trying the counts together, the People would be able to introduce the fact that Mayes is a convicted felon during the case in chief.

The People argued the evidence that Mayes possessed guns at other times was relevant to the murder charge because "the fact that he possesses guns shows that he does have access to a murder weapon."

The court concluded count 2 "ha[d] potentially some relevance to this case" and denied the motion.

### B.   Legal standards

Section 954 "provides in relevant part: 'An accusatory pleading may charge two or more different offenses *connected together in their commission*, or different statements of the same offense or two or more different offenses *of the same class of crimes or offenses*, under separate counts, and if two or more accusatory pleadings are filed in such cases in the same court, the court may order them to be consolidated.' [Citation.] The

8

statute also provides that 'the court in which a case is triable, in the interests of justice and for good cause shown, may *in its discretion* order that the different offenses or counts set forth in the accusatory pleading be tried separately or divided into two or more groups and each of said groups tried separately.' [Citation.]" (*People v. Soper* (2009) 45 Cal.4th 759, 769, fn. omitted (*Soper*).)

" 'Offenses of the same class are offenses which possess common characteristics or attributes.' [Citations.]" (*People v. Landry* (2016) 2 Cal.5th 52, 76; accord, *People v. Koontz* (2002) 27 Cal.4th 1041, 1075.) Offenses are connected in their commission for purposes of section 954 " ' "if there is a common element of substantial importance in their commission, for the joinder prevents repetition of evidence and saves time and expense to the state as well as to the defendant." ' [Citations.]" (*Alcala v. Superior Court* (2008) 43 Cal.4th 1205, 1218 (*Alcala*), italics omitted.) The requirement "may be satisfied even though 'the offenses charged "do not relate to the same transaction and were committed at different times and places . . . against different victims." ' [Citations.]" (*Ibid.*, italics omitted.)

" 'When . . . the statutory requirements for joinder are met, a defendant must make a clear showing of prejudice to establish that the trial court abused its discretion in denying the defendant's severance motion.' [Citation.] 'In determining whether a trial court's refusal to sever charges amounts to an abuse of discretion, we consider four factors: (1) whether evidence of the crimes to be jointly tried is cross-admissible; (2) whether some charges are unusually likely to inflame the jury against the defendant; (3) whether a weak case has been joined with a stronger case so that the spillover effect of aggregate evidence

9

might alter the outcome of some or all of the charges; and (4) whether any charge carries the death penalty or the joinder of charges converts the matter into a capital case.' [Citation.]" (*People v. Anderson* (2018) 5 Cal.5th 372, 388–389.)

When the statutory requirements for joinder are not met, but charges are nonetheless tried together, prejudice is measured under the standard of *People v. Watson* (1956) 46 Cal.2d 818, 836. (*People v. McLain* (1988) 46 Cal.3d 97, 105–106 (*McLain*); accord, *People v. Saldana* (1965) 233 Cal.App.2d 24, 30–31 [erroneous consolidation of cases will not result in reversal "unless there is such a miscarriage of justice as would violate article VI, section 4 1/2 of the California Constitution," now art. VI, § 13].) "[A] 'miscarriage of justice' should be declared only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*Watson*, at p. 836.) The test is "based upon reasonable probabilities rather than upon mere possibilities." (*Id.* at p. 837.)[3]

_____

[3] Mayes contends that the harmless beyond a reasonable doubt standard under *Chapman v. California* (1967) 386 U.S. 18 applies. The portion of *People v. Schuller* (2023) 15 Cal.5th 237 he relies upon concerns the failure to instruct a jury on an element of a charged offense, not improper joinder. (See *id.* at pp. 260–261.) We further note that federal courts review misjoinder claims using the less strict " 'substantial and injurious effect or influence' " test under *Kotteakos v. U.S.* (1946) 328 U.S. 750, 776, not the *Chapman* test. (*U.S. v. Lane* (1986) 474 U.S. 438, 449.)

### C.  Analysis

The murder and possession of a firearm by a felon counts did not satisfy the statutory requirements for joinder, as they were not offenses of the same class and were not connected in their commission.  (See *Walker v. Superior Court* (1974) 37 Cal.App.3d 938, 940–941 [armed robbery and felon in possession charges were not same class of crimes or connected in commission where the weapon used in each crime was different and crimes were separated by over three months].)  Indeed, on appeal, the People do not contend the offenses were properly joined under section 954.

However, the failure to sever the counts did not result in a miscarriage of justice.  Even when offenses are improperly joined, the factors that courts consider in determining whether a trial court has abused its discretion in failing to sever the charges remain instructive to assess whether it is reasonably probable the defendant would have obtained a more favorable result in the absence of joinder.[4]

_____

[4]    "In determining whether a trial court abused its discretion under section 954 in declining to sever properly joined charges, 'we consider the record before the trial court when it made its ruling.' [Citation.]" (*Soper, supra,* 45 Cal.4th at p. 774.) However, we are not limited to evidence presented at the preliminary hearing when deciding whether improper joinder resulted in a miscarriage of justice. (*McLain, supra,* 46 Cal.3d at p. 106 ["in view of the evidence adduced at trial," it was not reasonably probable the jury would not have found defendant guilty of both charges had they been severed]; cf. *Soper,* at p. 784 ["[c]onsidering the proceedings as a whole" when deciding whether joinder resulted in gross unfairness to defendant].)

First, it is undisputed that the evidence of the counts was not cross-admissible in this case. Yet "even the complete absence of cross-admissibility does not, by itself, demonstrate prejudice from a failure to order a requested severance." (*Alcala, supra*, 43 Cal.4th at p. 1221.)

With respect to the second factor, our Supreme Court has cautioned that it is improper for the prosecution to use a lesser but inflammatory crime to bolster its case on another more serious crime. (See *People v. Simon* (2016) 1 Cal.5th 98, 124.) Here, the lesser crime of possession of a firearm by a felon was not inflammatory. Although the jury learned that Mayes was a felon, the nature of the prior felony was not disclosed. When instructing the jury on count 2, the court told the jury not to consider the fact of Mayes's prior felony conviction for any other purpose and not to discuss or speculate as to the nature of the conviction. " 'We presume the jury followed these instructions.' [Citation.]" (*People v. Chhoun* (2021) 11 Cal.5th 1, 30.)

In addition, the evidence that Mayes possessed a gun in 2019 was insignificant as a demonstration that he had access to firearms, considering the jury heard evidence establishing that Mayes had access to guns around the time of Myers's murder. There was testimony that law enforcement officers found nine-millimeter cartridges at the barbershop during the September 2006 search; Garland testified that she had seen Mayes with a gun before Myers's death; and there was evidence that Mayes accidentally shot himself at his barbershop in 2005.

With respect to the third factor, we consider whether " 'a weak case has been joined with a stronger case so that the spillover effect of aggregate evidence might alter the outcome of some or all of the charges.' " (*People v. Holmes, McClain and*

*Newborn* (2022) 12 Cal.5th 719, 746.) Mayes argues that the evidence of both crimes was weak. We disagree. With respect to the possession charge, the gun had Mayes's DNA on it and was recovered from an RV, which Mayes accessed with a key. Mayes was the only person to enter the RV during officers' surveillance. They found his barber license inside. That another person's DNA was also on the gun did not significantly undermine the conclusion that the gun was in Mayes's possession. As the court instructed the jury, "two or more people may possess something at the same time" and "it is enough that the person has control over it or have the right to control it."

While there was limited physical evidence presented in support of the murder charge, the People proffered other significantly incriminating evidence. Mayes confessed to Solomon that he killed Myers hours after it happened. Solomon had also heard Mayes and Myers arguing earlier and he described hearing a loud sound from the back of the barbershop. He saw Mayes leave the barbershop and, upon Mayes's return, Mayes disclosed that he had disposed of Myers's body on the side of the 710 freeway. This was where Myers's body was later found. While Mayes's counsel vigorously attacked Solomon's credibility, his testimony was not the only evidence inculpating Mayes. Garland's testimony established that Mayes and Myers had a tumultuous relationship involving physical abuse and that Myers was with Mayes shortly before her death. Law enforcement also found a blanket in the barbershop after the murder with stains from Myers's blood. This was not weak evidence.

Further, there was little risk here of the cases "becom[ing], in the jurors' minds, one case which would be considerably

13

stronger than either viewed separately." (*Williams v. Superior Court* (1984) 36 Cal.3d 441, 454, superseded by statute on another ground, as stated in *Alcala, supra*, 43 Cal.4th at p. 1229, fn. 19.) The court instructed the jury to consider each count separately. More importantly, the nature of the two crimes was entirely different, as was the evidence the People presented on each crime. They took place 13 years apart and involved different guns. As Mayes concedes, the prosecutor did not argue to the jury that evidence that Mayes possessed a gun in 2019 suggested that he killed Myers in 2006, or vice versa.

It is not reasonably likely that Mayes would have obtained a more favorable result in the absence of the trial court's denial of his motion to sever.

## II. Any Error in Admitting Myers's Statement Concerning the Cause of Her Black Eye Was Harmless

Mayes contends the trial court erroneously admitted Myers's out-of-court statement about the cause of her black eye. We conclude any error in admitting Myers's statement was harmless under any standard.

### A. Background

During her examination of Garland, the prosecutor asked Garland about the time she saw Myers with a black eye. Garland had questioned Myers about the injury and Myers was "upset," spoke in a "high-pitched voice," and was crying. Garland stated that Myers's bruise "had gone down" but Garland could see "blood clogging her eye." The prosecutor asked whether Myers told her the cause of the injury. Garland responded, "Her and [Mayes] was [*sic*] fighting." Mayes's counsel objected on hearsay grounds. The trial court initially sustained the objection. The prosecutor

14

replied, "1270," presumably referring to the Evidence Code.  The court told the jury to disregard its instruction to strike the answer and that the answer would remain.  It denied Mayes's counsel's request to be heard.

The prosecutor then questioned Garland about a time she saw bruises elsewhere on Myers's face.  When Garland asked Myers about the bruises, Myers's demeanor was "upset" but she was not speaking "at the top of her lungs or high pitched."  Myers had been crying.  The prosecutor asked what Myers told Garland about the bruises.  Mayes's counsel again objected.  The trial court noted "it's [Evidence Code section] 1240, not 1270," and noted it seemed that time had passed between the event Myers described and the conversation Garland was recounting.  The court permitted the prosecutor to lay a foundation.

Garland did not know how long before the conversation Myers had been injured but testified that the bruises seemed fresh.  The prosecutor asked whether Myers described how she had been bruised.  Garland replied, "It's always fighting."  The court sustained an objection from Mayes's attorney.  The prosecutor instructed Garland to provide a "yes" or "no" answer.  Garland said, "Yes."  She stated that Myers continued to be upset and emotional when she explained how it happened.  The prosecutor then asked Garland what Myers had told her.  The trial court sustained a defense objection.

The court later instructed the jury that the People presented evidence of domestic violence that was not charged and they could consider this evidence only if the People had proved by a preponderance of the evidence that Mayes committed domestic violence.  If the jury concluded that Mayes had committed domestic violence, it could, but was not required to, conclude that

15

he was inclined to commit domestic violence and was likely to commit murder. The court instructed that the uncharged domestic violence was only one factor to consider and was not sufficient on its own to prove that Mayes was guilty of murder.

## B.    Analysis

"Evidence of a statement is not made inadmissible by the hearsay rule if the statement: [¶] (a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and [¶] (b) Was made spontaneously while the declarant was under the stress of excitement caused by such perception." (Evid. Code, § 1240.)

Mayes contends the trial court erred in admitting Myers's out-of-court statement explaining her black eye because there was no indication the statement "[w]as made spontaneously while the declarant was under the stress of excitement caused by such perception," under the factors set forth by our Supreme Court. (Evid. Code, § 1240, subd. (b).) We need not decide whether the statement satisfied the Evidence Code section 1240 admissibility requirements because, even if admitted improperly, any error was harmless.

Myers's statement was cumulative of other evidence the court properly admitted. Garland testified that Myers and Mayes had a "rocky" relationship, she had witnessed them arguing, and she had twice confronted Mayes about injuries she saw on Myers. Indeed, Garland testified that she told Mayes "to keep his hands off [her] motherfucking child"; she would kill *him* if he did not stop "putting his hands on [Myers]"; and "one day he was going to kill [Myers]." This testimony was more provocative than Myers's statement that she had a black eye because she and Mayes had fought. Moreover, although Solomon saw Myers only "briefly" at

16

the barbershop, he testified that Mayes and Myers were "[a]lways angry, always fighting" and "grabbing, tussling" during those times.

Mayes contends the error deprived him of due process because "the evidence was subject to a much lower standard of proof than proof beyond a reasonable doubt," citing the instruction on uncharged domestic violence. However, even without Myers's statement concerning the cause of her bruise, there was ample evidence to support a jury finding that it was more likely than not that Mayes had intentionally caused bodily injury to Myers for purposes of the uncharged domestic violence instruction.

## III. The Trial Court Did Not Err in Excluding the Recording of Mayes's Reaction To News of Myers's Death

Mayes contends the trial court erroneously excluded a recorded interview in which a detective told him Myers was dead and Mayes said, "you're lying," then broke down crying. He argues any statement made in the video was not hearsay and the exclusion of the video, which showed consciousness of innocence or remorse, deprived him of due process. The People concede that the trial court erred in concluding the evidence was irrelevant but argue that it was properly excluded under Evidence Code section 352. We conclude the trial court did not err in excluding the recording.

### A. Background

Before trial, defense counsel informed the court that the defense sought to admit a recorded interview of Mayes. The video captured the moment a detective informed Mayes of Myers's death. Defense counsel explained the video showed that

Mayes's "reaction was immediate and rather emotional." Counsel sought to admit it "not for the truth of [Mayes's] statements" but "to show [Mayes's] reaction." The prosecutor objected.

The trial court asked why the statement would not be hearsay. Mayes's counsel argued that it was an excited utterance. He stated that the video showed the detective "start to talk to [Mayes] about the death of his wife, and his response was something to the effect of you're joking, right? . . . [A]nd then all of a sudden he breaks down in an emotional throe of tears . . . ."

Defense counsel played the video for the court. He represented that Mayes was "whispering in the background, you're lying, you're lying, you're lying," and argued the reaction negated specific intent. The court requested the transcript and video.

The trial court later ruled the video would not be admitted because it was not relevant. The court indicated that it was possible the "People may open the door or [it] may see the relevance," but excluded it for the time being. The matter was not raised again.

### B.    Applicable law

"We review a trial court's ruling excluding evidence on grounds of irrelevance (Evid. Code, § 350) for abuse of discretion." (*People v. Thornton* (2007) 41 Cal.4th 391, 444.)  " ' "[W]e review the ruling, not the court's reasoning and, if the ruling was correct on any ground, we affirm." ' [Citation.]" (*People v. Brooks* (2017) 3 Cal.5th 1, 39 [affirming evidentiary ruling on different ground than trial court relied on].)

Evidence Code section 350 provides that "[n]o evidence is admissible except relevant evidence." Under Evidence Code section 352, "The court in its discretion may exclude evidence if

18

its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

Our Supreme Court discussed the admissibility of consciousness of innocence evidence at length in *People v. Cowan* (2010) 50 Cal.4th 401 (*Cowan*).  In that case, the defendant sought to admit evidence that he offered to " 'come down right now' " and speak with a detective about a murder case, which he argued showed a lack of consciousness of guilt.  (*Id*. at p. 472.) Our Supreme Court concluded the trial court did not abuse its discretion in excluding this evidence.  (*Ibid*.)  In a long line of cases, our high court had "held that evidence that the defendant did not flee from a crime scene is inadmissible to show consciousness of innocence, even though such evidence has '*some* "tendency in reason" to prove this fact.' [Citations.]" (*Ibid*.)  "By parity of reasoning, other consciousness of innocence evidence . . . although relevant, properly may be excluded on the ground that its slight probative value is outweighed by the risk of confusing the issues." (*Id*. at p. 473.)  The court explained that "there are numerous plausible reasons why a guilty person might offer to talk to the police," including a "desire to appear innocent, or . . . to lie to the police to deflect suspicion from himself or to present a false alibi." (*Ibid*.)  "Against such slight probative value, the risk of confusing the issues or of delaying the trial is strong, since if the evidence were admitted, the prosecution would have to be given the opportunity to explain the circumstances surrounding the defendant's offer and to present evidence negating an inference of innocence." (*Ibid*.)

19

Our Supreme Court also rejected the defendant's contention that the exclusion of this evidence violated his federal constitutional right to present a defense. (*Cowan*, *supra*, 50 Cal.4th at p. 473.) The trial court had " 'merely rejected certain evidence concerning the defense' " and "defendant was not otherwise precluded from presenting his defense through admissible testimony and evidence." (*Id*. at pp. 473–474.) Finally, the Supreme Court concluded that if the trial court had erred, it was harmless under any standard. "The proffered evidence, although relevant to consciousness of innocence, was 'less than compelling . . . since, if [defendant] had been involved in [the] murder, it can be assumed he would have lied to a police detective questioning him about it.' [Citation.] The ambiguous nature of the evidence thus counsels against any finding that its exclusion affected the verdicts." (*Id*. at p. 474.)

### C.     Analysis

The record indicates that, upon being told by a detective that Myers was dead, Mayes responded "you're lying" and began to cry. We agree that Mayes's statement was not hearsay because it was offered for the nonhearsay purpose of showing Mayes's reaction to news of Myers's death. According to Mayes, this reaction showed consciousness of innocence and suggested he was not responsible for Myers's murder.

Nevertheless, for the reasons set forth in *Cowan*, evidence of Mayes's reaction was properly subject to exclusion under Evidence Code section 352. There are many plausible reasons why a person involved in the killing of a spouse would express disbelief and cry upon being told he or she is dead, including a desire to deflect suspicion and appear innocent. The inferences arising from the evidence were ambiguous, and any minimal

20

probative value was outweighed by the risk of confusing the jury or causing an undue consumption of time, as the prosecution would have the opportunity to submit additional evidence negating the inference of innocence.

Even if the court erred in excluding the evidence, any error was harmless. We disagree with Mayes's contention that the evidence here was far more compelling proof of innocence than the evidence in *Cowan*. As in *Cowan*, it can be assumed that Mayes would have feigned shock and either feigned or experienced strong emotions at being confronted with Myers's death, even if he was involved. Thus, it is unlikely that the exclusion of this ambiguous evidence affected the verdicts. Moreover, its exclusion did not deprive Mayes of the ability to present a defense, as he was not otherwise precluded from presenting his defense through admissible testimony and evidence.

Mayes alternatively contends that his reaction to the news that Myers was dead is evidence of remorse. He contends the Supreme Court's statement that " '[*u*]*nless* a defendant opens the door to the matter in his or her case-in-chief [citation], his or her remorse is irrelevant at the guilt phase' " means that a defendant may *always* introduce evidence of remorse in his or her case-in-chief. (*People v. Dykes* (2009) 46 Cal.4th 731, 768 (*Dykes*).) We disagree.

The issue before the court in *Dykes* was not whether evidence of remorse is always admissible or even whether it was properly admitted in that case, but whether the prosecutor committed misconduct by eliciting inadmissible testimony about the defendant's absence of remorse from an officer who had questioned the defendant. (*Dykes*, *supra*, 46 Cal.4th at p. 767.)

21

Thus, it does not support the proposition for which Mayes cites it. (*In re Chavez* (2003) 30 Cal.4th 643, 656 ["[A] case is authority only for a proposition actually considered and decided therein."].) Whether offered to show consciousness of innocence or remorse, the evidence here was highly ambiguous and, under the reasoning of *Cowan*, could reasonably be excluded.

## IV. There Was No Cumulative Error Requiring Reversal

Mayes contends the cumulative effect of the alleged errors deprived him of his federal due process right to a fair trial. " '[A] series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error.' " (*People v. Cunningham* (2001) 25 Cal.4th 926, 1009.) "The 'litmus test' for cumulative error 'is whether defendant received due process and a fair trial.' [Citation.]" (*People v. Cuccia* (2002) 97 Cal.App.4th 785, 795.) A judgment will not be reversed "absent a clear showing of a miscarriage of justice." (*People v. Hill* (1998) 17 Cal.4th 800, 844.)

We have found no substantial error in any respect and therefore reject Mayes's claim of cumulative prejudicial error. (*People v. Butler* (2009) 46 Cal.4th 847, 885; *People v. Bradford* (1997) 14 Cal.4th 1005, 1057 [defendant is entitled to a fair trial, not a perfect one].)

## V. The Trial Court Did Not Abuse its Discretion in Denying Mayes's Request for a Continuance

Finally, Mayes contends the court erred in denying his request for a continuance to prepare a motion for a new trial after it granted his *Faretta* motion. We find no abuse of discretion.

### A. Background

Mayes represented himself from at least early 2020 to January 6, 2021, when he requested that the court appoint an

22

attorney to represent him. During that time, Mayes had access to private investigators and the court granted him funds for a DNA expert, who conducted testing on the blanket law enforcement found in the barbershop.

The record indicates that Tina Montalvo discovered Myers's body in 2006 and, when interviewed in 2017 or 2019, she made statements that may have assisted Mayes's defense.[5] On January 6, 2021, Montalvo appeared to testify at Mayes's preliminary hearing, but the hearing was continued at Mayes's request. Subsequently, neither the People nor Mayes's attorney were able to locate her. In the middle of trial, defense counsel made an oral motion under *Serna v. Superior Court* (1985) 40 Cal.3d 239, on the ground, among others, that he had been unable to locate Montalvo despite "ma[king] every earnest effort to find her," and the loss of this potentially exculpatory witness was because the case was "substantially old" by the time the People brought it to trial. Defense counsel later filed a motion to dismiss for denial of a speedy trial. Counsel argued that he and his investigator had been unsuccessful in their efforts to locate Montalvo because of the People's delay. The trial court denied the motion.

Mayes's sentencing was originally scheduled for June 6, 2023. On June 6, defense counsel requested a continuance to

_____

[5] Montalvo originally told police at the scene that she had walked past the location where Myers's body was found around midnight on July 15, 2006, and had not seen the body, but discovered it several hours later in that location. Years later, Montalvo said she had first seen Myers and a man arguing outside a red four-door vehicle earlier in the evening, then later she discovered Myers's body. Montalvo was known to be transient and she disclosed that she used drugs.

June 21 for sentencing and a hearing on the motion for new trial that counsel had just filed on Mayes's behalf. Mayes agreed to waive time. On June 21, 2023, defense counsel informed the court that Mayes wanted to resume in propria persona (pro. per.) status. The court explained the disadvantages of self-representation. Mayes confirmed that he understood and wished to represent himself. The court found that Mayes had voluntarily and knowingly waived his right to counsel and granted him pro. per. status. Defense counsel provided Mayes with a copy of the motion for a new trial and asked the court whether he was relieved. The trial court replied: "Let me find out something from Mr. Mayes. [¶] Mr. Mayes, are you ready to go forward?" Mayes replied, "Yes, sir." The trial court relieved Mayes's counsel.

Immediately thereafter, Mayes told the court he wanted to return in 30 days to argue the new trial motion and he intended to bring a motion on different grounds, including ineffective assistance of counsel.[6] The court told Mayes it would give him until the following Monday and stated that Mayes's agreement that he was ready to proceed was the "only basis on which [it] granted [him] . . . pro per status." The court later asked whether Mayes wanted substitute counsel to be appointed to represent him on the motion. Mayes confirmed that he wished to represent himself.

The prosecutor argued that ineffective assistance of counsel was not a ground for a new trial motion under section 1181. The

---

[6] Mayes asserted he had "a lot of grounds" for his motion, including "Fourth and Fourteenth Amendment *Gerstein* violation," "Fourteenth Amendment *Napue* violation," "Fourteenth Amendment *Brady* violation," "*Trombetta Youngblood*," and a "*Youngblood Brady*."

24

trial court stated it was "not inclined to put this matter over for months and months and months on grounds that, frankly, aren't allowed under the statute." It further expressed its belief that Mayes had not "listed one ground that's not raised in papers and put in issue already that's proper under 1181 of the Penal Code." It continued the hearing to the following week.

Mayes filed a motion for a further continuance which was dated June 22 but file stamped on June 26, 2023. He argued that he needed additional time to prepare his new trial motion because the motion filed by his former attorney was "not adequate & does not bring to light the constitutional deprivations that led to an unfair trial. . . ." Mayes also stated that he was not currently housed in the pro. per. housing unit and had not been provided materials or an investigator.

On June 26, the court invited Mayes to argue the new trial motion. Mayes explained that he had filed a motion to further continue the hearing. He was seeking 45 days to prepare and file another new trial motion. Mayes asserted he needed time to research the law, procure witness affidavits, and add other evidence to the record. The court asked what Mayes needed to add to the record. Mayes argued that he needed to get affidavits from Montalvo and from "Raheem" and "Blacky," the two individuals Solomon had testified were also at the barbershop on the night of Myers's death. He claimed that his former counsel failed to elicit all the inconsistencies between Solomon's statements to detectives and his trial testimony. Mayes also asserted that the prosecutor had committed misconduct in her closing argument because he had phone records contradicting her statement that he had not attempted to locate Myers.

The trial court denied the motion for a further continuance. The court ruled the motion was not timely filed and, even if it had been, there was not good cause to continue proceedings. The court denied the motion for a new trial filed by defense counsel and Mayes's oral motion.

### B. Applicable legal principles

"The determination of whether a continuance should be granted rests within the sound discretion of the trial court, although that discretion may not be exercised so as to deprive the defendant or his attorney of a reasonable opportunity to prepare." (*People v. Sakarias* (2000) 22 Cal.4th 596, 646.) A trial court should " ' " 'consider not only the benefit which the moving party anticipates but also the likelihood that such benefit will result . . . and, above all, whether substantial justice will be accomplished or defeated by a granting of the motion.' " [Citation.]' " (*People v. Panah* (2005) 35 Cal.4th 395, 423.) " 'There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied.' " (*People v. Crovedi* (1966) 65 Cal.2d 199, 207, quoting *Ungar v. Sarafite* (1964) 376 U.S. 575, 589.)

Relying on *People v. Hill* (1983) 148 Cal.App.3d 744, Mayes contends that once the trial court granted his *Faretta* motion, it was required to also grant his request for a reasonable continuance. We note that *Hill* is distinguishable from this case, as *Hill* concerned a defendant's request for a continuance to prepare for trial after the court granted a *Faretta* motion on the eve of trial. Here, Mayes's request to represent himself came after trial, and his request for a continuance was for additional

26

time to file a second motion for new trial. Moreover, in *People v. Jenkins* (2000) 22 Cal.4th 900, 1039 (*Jenkins*), the Supreme Court rejected the argument that if a court grants a motion for self-representation, it must necessarily grant the defendant a continuance, in all circumstances. In that case, the court found the trial court did not deprive the defendant of due process by denying his request for a continuance after the court granted his mid-trial *Faretta* motion. (*Ibid.*)

The *Jenkins* court explained that not every denial of a request for continuance violates due process, " 'even if the party fails to offer evidence or is compelled to defend without counsel.' [Citation.]" (*Jenkins*, *supra*, 22 Cal.4th at p. 1039.) "Even in a capital case, if the defendant cannot show he or she has been diligent in securing the attendance of witnesses, or that specific witnesses exist who would present material evidence, '[g]iven the deference necessarily due a state trial judge in regard to the denial or granting of continuances,' the court's ruling denying a continuance does not support a claim of error under the federal Constitution." (*Id.* at pp. 1039–1040.) Thus, the propriety of denying a continuance is a fact-specific inquiry. (*Ibid.*)

### C. Analysis

Mayes argues that, because he was represented by counsel and had no right to file his own new trial motion until he was granted pro. per. status, his diligence can only be measured from that time. However, in *Jenkins*, the Supreme Court explained that the defendant was no more entitled to a continuance for investigation and further preparation than his attorney, who had unsuccessfully made such a request. (*Jenkins*, *supra*, 22 Cal.4th at p. 1039.) The court also noted that the defendant " 'had a full

27

opportunity to prepare independently for trial even while he was represented by counsel.' [Citation.]" (*Ibid*.) *Jenkins* establishes that a court may consider circumstances preceding the order granting a defendant pro. per. status when deciding whether a denial of a continuance supports a claim of error under the federal Constitution.

In assessing Mayes's diligence in developing the grounds for a new trial motion, it is significant that Mayes previously represented himself and had been appointed private investigators for a period of approximately one year between 2020 and 2021. Although the exact bases for his new trial motion were not entirely clear, to the extent they required that Mayes obtain statements from witnesses, the trial court could reasonably conclude Mayes did not demonstrate he acted diligently in obtaining that evidence. The witnesses he identified were known to him even when he was in control of his own defense.

Further, while Mayes argued he needed a continuance to attempt to obtain affidavits from Montalvo, "Raheem," and "Blacky," he failed to demonstrate that these witnesses' affidavits would provide permissible grounds for a motion for new trial. These individuals were not newly discovered. And considering Solomon testified at trial, there is no reason to believe that he would provide an affidavit contradicting his trial testimony. The denial of a continuance to allow Mayes to obtain affidavits from these individuals was not unreasonable and does not support a claim of error under the federal Constitution.

Similarly, Mayes argues on appeal that he "also wanted to present claims of lost or destroyed evidence, knowing presentation of false testimony, and *Brady* violations." Yet, Mayes failed to demonstrate to the trial court that, to the extent

28

these claims were based on information he already had, a 45-day continuance was reasonably necessary to present a new trial motion based on them. Indeed, at least one *Brady* issue was included in the motion for new trial defense counsel had already filed. To the extent the claims required the gathering of evidence Mayes did not possess, Mayes did not show there was specific material evidence he sought to obtain, or that he had been diligent in attempting to obtain the evidence. (See *Jenkins*, *supra*, 22 Cal.4th at p. 1038 [continuance properly denied when defendant did not demonstrate a continuance would be useful in producing specific relevant evidence within a reasonable time].)

On appeal, Mayes identifies only one specific statutory or nonstatutory basis for the new trial motion he sought to present, the ineffective assistance of counsel. Mayes contends the trial court erred when it denied the motion for a continuance on the ground that ineffective assistance of counsel was not a proper basis for the motion for new trial. We disagree.

The decisions of our Supreme Court establish that a trial court may consider a claim for ineffective assistance of counsel in a motion for new trial. Because "trial judges are particularly well suited to observe courtroom performance and to rule on the adequacy of counsel in criminal cases tried before them," "in appropriate circumstances justice will be expedited by avoiding appellate review, or habeas corpus proceedings, in favor of presenting the issue of counsel's effectiveness to the trial court as the basis of a motion for new trial." (*People v. Fosselman* (1983) 33 Cal.3d 572, 582.) However, a trial court is well within its discretion in declining to consider an ineffective assistance of counsel claim in a motion for new trial if the claim is based primarily on the attorney's conduct outside of the courtroom.

29

(*People v. Cornwell* (2005) 37 Cal.4th 50, 101 (*Cornwell*), disapproved on another ground by *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

Mayes's claim was based on defense counsel's decision not to call "Raheem" and "Blacky" as witnesses and his failure to call out additional inconsistencies between Solomon's trial testimony and his interviews with detectives. Mayes asserted the inconsistencies were apparent from materials that were not part of the trial record. Mayes's claim therefore appeared to rest "primarily upon matters other than what the trial court could have observed during trial." (*Cornwell*, *supra*, 37 Cal.4th at p. 101.) As such, the trial court reasonably concluded that Mayes's ineffective assistance claim would not be a proper subject of a motion for new trial and was not good cause for a continuance.

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

ADAMS, J.

We concur:

EGERTON, Acting P. J.

HANASONO, J.